938 F.2d 190
 290 U.S.App.D.C. 371, 21 Envtl. L. Rep. 21,142
 CITIZENS AGAINST BURLINGTON, INC., et al., Petitioners,
v.
James B. BUSEY IV, Administrator, Federal Aviation
Administration, Respondent,
Toledo-Lucas County Port Authority and Burlington Air
Express, Inc., Intervenors.
 No. 90-1373.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 1, 1990.
Decided June 14, 1991.
 
 Petition for Review of an Order of the Federal Aviation Administration.
 Bruce J. Terris, with whom James M. Hecker was on the brief, Washington, D.C., for petitioners.
 David C. Shilton, Attorney, Dept. of Justice, Washington, D.C., for respondent. With him on the brief were Barry M. Hartman, Acting Asst. Atty. Gen., Peter R. Steenland, Attorney, Dept. of Justice, and Gregory S. Walden, Chief Counsel, Federal Aviation Admin., Washington, D.C.
 Jim J. Marquez, Washington, D.C., with whom Teresa L. Grigsby, Toledo, Ohio, for Toledo-Lucas County Port Authority, and John W. Simpson, Washington, D.C., for Burlington Air Express, Inc., were on the joint brief, for intervenors. Stephen H. Lachter, Washington, D.C., also entered an appearance for intervenors.
 Before BUCKLEY, WILLIAMS, and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge THOMAS.
 Opinion dissenting in part filed by Circuit Judge BUCKLEY.
 CLARENCE THOMAS, Circuit Judge:
 
 
 1
 The city of Toledo decided to expand one of its airports, and the Federal Aviation Administration decided to approve the city's plan. In this petition for review of the FAA's order, an alliance of people who live near the airport contends that the FAA has violated several environmental statutes and regulations. We hold that the FAA has complied with all of the statutes and all but one of the regulations.
 
 I.
 
 2
 The Toledo Express Airport, object of the controversy in this case, lies about twenty-five miles to the west of downtown Toledo. Half a mile to the southwest of the airport, surrounded by four highways and intersected by three more, lies the Oak Openings Preserve Metropark, used by joggers, skiers, and birders, and site of one of the world's twelve communities of oak savannas. Within Oak Openings lies the Springbrook Group Camp, site of a primitive (tents only) campground, and used by hikers and campers, including Richard Van Landingham III, one of the petitioners in this lawsuit. Near the airport live Daniel Kasch, Carol Vaughan, and Professor William Reuter, three of the other petitioners. The Toledo-Lucas County Port Authority, one of the intervenors, wants to make the city of Toledo a cargo hub. Burlington Air Express, Inc., the other intervenor, wants to move its operations to Toledo. Kasch, Vaughan, Reuter, Van Landingham, and others have formed Citizens Against Burlington, Inc. to stop them.
 
 
 3
 Citizens Against Burlington first materialized about a year after the Port Authority first commissioned an "Airport Noise Compatibility Planning" study (known as a "Part 150 study," see generally 14 C.F.R. pt. 150 & apps. A & B) and began to consider the possibility of the airport's expansion. The Port Authority soon heard from Burlington Air Express, which had been flying its planes out of an old World War II hangar at Baer Field, an Air National Guard airport in Fort Wayne. After looking at seventeen sites in four midwestern states, Burlington chose the Toledo Express Airport. Among Burlington's reasons were the quality of Toledo's work force and the airport's prior operating record, zoning advantages, and location (near major highways and close to Detroit and Chicago). For its part, the Port Authority expects the new hub to create one thousand new jobs in metropolitan Toledo and to contribute almost $68 million per year to the local economy after three years of the hub's operation. The Port Authority plans to pay for the new hub with both private and public funds. Much of the money, however, will come from user fees and lease agreements, and more than half will come from local bonds issued to private investors. Grants from the city of Toledo and the state of Ohio will make up another, much smaller portion of the costs. The Port Authority has applied for some federal funds as well, but the FAA has reacted coolly to the Port Authority's feelers.
 
 
 4
 The Port Authority agreed to let Burlington move to Toledo when Burlington's lease at Baer Field expired, in October 1990. Burlington later extended its lease in Fort Wayne, and the Port Authority now expects Burlington to move to Toledo Express in January 1992. First, though, the Port Authority has to accommodate Burlington's operations. In the first stage of the airport's expansion, the Port Authority plans to build a concrete ramp for cargo planes, a warehouse for sorting freight, lighting for the warehouse and the area around it, a road to the warehouse, a fuel farm, a maintenance building, taxiway connections to one of the airport's runways and lighting for the new taxiways, an overrun area attached to one of the runways, new power outlets for parked airplanes, and storage areas for de-icing equipment. In the second stage of expansion, planned for the five years after Burlington's move, the Port Authority wants to extend one of the airport's primary runways, install a landing system nearby, and build a new taxiway parallel to the extended runway.
 
 
 5
 The Port Authority submitted its proposal to the FAA on February 2, 1989 and promptly hired Coffman Associates, Inc., a consulting firm, to prepare an environmental assessment, see 40 C.F.R. Secs. 1501.3, 1508.9, and then to convert the environmental assessment into an environmental impact statement (EIS), see id. Sec. 1501.4; 42 U.S.C. Sec. 4332(2)(C). In December 1989, the FAA sent a draft of the EIS to the Environmental Protection Agency and several state and local agencies. See id. Sec. 7609; 40 C.F.R. Secs. 1503.1, 1503.2. Early the next month, the FAA made the draft public and held a public hearing. See id. Sec. 1502.19. Over the following six weeks, Citizens Against Burlington sent the FAA twenty-five letters, commenting on virtually every aspect of the EIS. Individuals sent over three hundred more.
 
 
 6
 On May 11, 1990, the FAA published a final environmental impact statement. The first chapter of the statement explained that the Port Authority needed the FAA's approval for its plan to expand the Toledo Express Airport and described the role in that process that Congress meant for the agency to play. The second chapter of the EIS reviewed the particulars of the Port Authority's plan, listed the fourteen separate federal statutes and regulations that applied to the Port Authority's proposal, briefly described some alternatives to acting on the Port Authority's plan, and explained why the agency had decided not to discuss those possibilities more fully. The FAA then concluded that it had to consider in depth the environmental impacts of only two alternatives: the approval of the Port Authority's plan to expand the airport, and no action. The third chapter of the EIS described the environment affected by the proposal, and the fourth chapter detailed the environmental consequences of the two alternatives. After summarizing the environmental impacts in the fifth chapter, the agency listed in the sixth chapter the statement's preparers. Appendices to the statement collected scientific data and relevant inter-agency correspondence. In the second volume of the statement, the FAA compiled copies of the hundreds of letters concerning the draft EIS, a transcript of the public hearing, and written comments submitted after the hearing had ended.
 
 
 7
 Having approved the final EIS, the agency faced a final choice: whether to endorse the Port Authority's plan, which the agency preferred, or not to endorse the plan. In a record of decision dated July 12, 1990, the FAA approved the plan to expand the Toledo Express Airport. See 49 U.S.C. app. Secs. 1349(a), 2208(b). Five days later, Citizens petitioned this court for review of the FAA's order and for a stay of the order pending our decision. See id. app. Sec. 1486(a), (d). On August 1, we denied the latter request.
 
 
 8
 Citizens continues to press for wide-ranging declaratory and injunctive relief, asking this court to vacate the FAA's decision, to force the agency to prepare a new EIS, to enjoin the agency from approving the Port Authority's current plan, and to enjoin any further construction at Toledo Express until the FAA complies with the applicable laws. Citizens contends that the FAA has violated the National Environmental Policy Act, regulations promulgated by the Council on Environmental Quality, the Department of Transportation Act, and the Airport and Airway Improvement Act. We consider these arguments in turn.
 
 II.
 A.
 
 9
 In the National Environmental Policy Act of 1969 (NEPA), Pub.L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. Secs. 4321-4370b), Congress resolved "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." NEPA Sec. 101(a), 42 U.S.C. Sec. 4331(a).[1] These sweeping policy goals have inspired some commentators to call NEPA an environmentalist Magna Carta. See, e.g., D. Mandelker, NEPA Law and Litigation Sec. 1:01, at 1 (1990); cf. 40 C.F.R. Sec. 1500.1(a) ("[NEPA] is our basic national charter for protection of the environment."). But instead of ordering, say, that deforested land be reforested, Congress chose to make NEPA procedural. NEPA commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348, 109 S.Ct. 1835, 1844-45, 104 L.Ed.2d 351 (1989); see also 40 C.F.R. Sec. 1502.1. NEPA does not mandate particular consequences.
 
 
 10
 Just as NEPA is not a green Magna Carta, federal judges are not the barons at Runnymede. Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results. See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). As the Supreme Court has warned, "once an agency has made a decision subject to [Nepa]'s procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot ' "interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' " Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam) (citation omitted); see Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) ("Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.").
 
 
 11
 In short, the obligations that NEPA levies on agencies determine the role of the courts in the statute's enforcement. This case concerns the most important responsibility that NEPA demands--that an agency reviewing proposals for action prepare an environmental impact statement, and, more specifically, that the agency discuss in its statement alternatives to the action proposed. We consider here whether the FAA has complied with NEPA in publishing an environmental impact statement that discussed in depth two alternatives: approving the expansion of the Toledo Express Airport, and not approving the expansion of the Toledo Express Airport.
 
 
 12
 (1)
 
 
 13
 Federal agencies must prepare environmental impact statements when they contemplate "major Federal actions significantly affecting the quality of the human environment." NEPA Sec. 102(2)(C), 42 U.S.C. Sec. 4332(2)(C).[2] An EIS must discuss, among other things, "alternatives to the proposed action," NEPA Sec. 102(2)(C)(iii), 42 U.S.C. Sec. 4332(2)(C)(iii), and the discussion of alternatives forms "the heart of the environmental impact statement." 40 C.F.R. Sec. 1502.14; see Alaska v. Andrus, 580 F.2d 465, 474 (D.C.Cir.), vacated in part as moot sub nom. Western Oil & Gas Ass'n v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).
 
 
 14
 The problem for agencies is that "the term 'alternatives' is not self-defining." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). Suppose, for example, that a utility applies for permission to build a nuclear reactor in Vernon, Vermont. Free-floating "alternatives" to the proposal for federal action might conceivably include everything from licensing a reactor in Pecos, Texas, to promoting imports of hydropower from Quebec. If the Nuclear Regulatory Commission had to discuss these and other imaginable courses of action, its statement would wither into "frivolous boilerplate," id., if indeed the agency were to prepare an EIS at all and not instead just deny the utility a permit. If, therefore, the consideration of alternatives is to inform both the public and the agency decisionmaker,[3] the discussion must be moored to "some notion of feasibility." Vermont Yankee, 435 U.S. at 551, 98 S.Ct. at 1215; seeid. ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every device and thought conceivable by the mind of man.").
 
 
 15
 Recognizing the harm that an unbounded understanding of alternatives might cause, see id. at 549-55, 98 S.Ct. at 1214-17, CEQ regulations oblige agencies to discuss only alternatives that are feasible, or (much the same thing) reasonable. 40 C.F.R. Secs. 1502.14(a)-(c), 1508.25(b)(2); see Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed.Reg. 18,026, 18,026 (1981) [hereinafter Forty Questions]. But the adjective "reasonable" is no more self-defining than the noun that it modifies. Consider two possible alternatives to our nuclear reactor in Vernon. Funding research in cold fusion might be an unreasonable alternative by virtue of the theory's scientific implausibility. But licensing a reactor in Lake Placid, New York might also be unreasonable, even though it passes some objective test of scientific worth. In either case, the proposed alternative is reasonable only if it will bring about the ends of the federal action--only if it will do what the licensing of the reactor in Vernon is meant to do. See City of New York v. Department of Transp., 715 F.2d 732, 742-43 (2d Cir.1983) (construing NEPA Sec. 102(2)(E), 42 U.S.C. Sec. 4332(2)(E) (discussion of alternatives in environmental assessments)), cert. denied, 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984); see also City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir.1986) (per curiam) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved."), cert. denied, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987).[4] If licensing the Vernon reactor is meant to help supply energy to New England, licensing a reactor in northern New York might make equal sense. If licensing the Vernon reactor is meant as well to stimulate the Vernon job market, licensing a reactor in Lake Placid would be far less effective. The goals of an action delimit the universe of the action's reasonable alternatives.
 
 
 16
 We have held before that an agency bears the responsibility for deciding which alternatives to consider in an environmental impact statement. See North Slope Borough v. Andrus, 642 F.2d 589, 601 (D.C.Cir.1980). We have also held that an agency need follow only a "rule of reason" in preparing an EIS, see Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 834, 837 (D.C.Cir.1972), and that this rule of reason governs "both which alternatives the agency must discuss, and the extent to which it must discuss them," Alaska v. Andrus, 580 F.2d at 475; see Allison v. Department of Transp., 908 F.2d 1024, 1031 (D.C.Cir.1990). It follows that the agency thus bears the responsibility for defining at the outset the objectives of an action. See City of Angoon v. Hodel, 803 F.2d at 1021; cf. 40 C.F.R. Sec. 1502.13. As the phrase "rule of reason" suggests, we review an agency's compliance with NEPA's requirements deferentially. We uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and we uphold its discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail.
 
 
 17
 We realize, as we stated before, that the word "reasonable" is not self-defining. Deference, however, does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that drive them. Environmental impact statements take time and cost money. Yet an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality. See City of New York v. Department of Transp., 715 F.2d at 743. Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities.
 
 
 18
 Instead, agencies must look hard at the factors relevant to the definition of purpose. When an agency is asked to sanction a specific plan, see 40 C.F.R. Sec. 1508.18(b)(4), the agency should take into account the needs and goals of the parties involved in the application. See, e.g., Louisiana Wildlife Fed'n v. York, 761 F.2d 1044, 1048 (5th Cir.1985) (per curiam); Roosevelt Campobello Int'l Park Comm'n v. EPA, 684 F.2d 1041, 1046-47 (1st Cir.1982). Perhaps more importantly, an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives. See City of New York v. Department of Transp., 715 F.2d at 743-45 (Congress instructed the Department of Transportation to create safety regulations for carrying nuclear fuel by interstate highway; the Department was not required to discuss the unreasonable alternative of carrying nuclear fuel around New York City by barge); cf. Izaak Walton League of Am. v. Marsh, 655 F.2d 346, 372 (D.C.Cir.) ("When Congress has enacted legislation approving a specific project, the implementing agency's obligation to discuss alternatives in its [EIS] is relatively narrow."), cert. denied, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).
 
 
 19
 Once an agency has considered the relevant factors, it must define goals for its action that fall somewhere within the range of reasonable choices. We review that choice, like all agency decisions to which we owe deference, on the grounds that the agency itself has advanced. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).
 
 
 20
 (2)
 
 
 21
 In the first chapter of its environmental impact statement, the FAA begins by noting that the Port Authority had requested the agency's approval of the plan to develop Toledo Express. The agency then explains that "[t]he purpose and need for this action lies in [the] FAA's responsibility to review the airport design and runway configuration with respect to its safety, efficiency and utility within the national airspace system and its environmental impact on the surrounding area." After surveying the engineering reasons that justify an extended runway and new facilities, the FAA concludes by stating that the agency "has a statutory mandate to facilitate the establishment of air cargo hubs under Section 502(a)(7) [of the Airport and Airway Improvement Act of 1982 (AAIA), 49 U.S.C. app. Sec. 2201(a)(7) ] and to undertake capacity enhancement projects under Section 502(a)(11) [of the AAIA, 49 U.S.C. app. Sec. 2201(a)(11) ]."
 
 
 22
 In the second chapter of the environmental impact statement, the FAA begins by stating:The scope of alternatives considered by the sponsoring Federal agency, where the Federal government acts as a proprietor, is wide ranging and comprehensive. Where the Federal government acts, not as a proprietor, but to approve and support a project being sponsored by a local government or private applicant, the Federal agency is necessarily more limited. In the latter instance, the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.
 
 The agency goes on to explain:
 
 23
 In the present system of federalism, the FAA does not determine where to build and develop civilian airports, as an owner/operator. Rather, the FAA facilitates airport development by providing Federal financial assistance, and reviews and approves or disapproves revisions to Airport Layout Plans at Federally funded airports.... Similarly, under the Airline Deregulation Act of 1978, the FAA does not regulate rates, routes, and services of air carriers or cargo operators. Airline managements are free to decide which cities to serve based on market forces.
 
 
 24
 The EIS then describes five alternatives: approving the Port Authority's plan for expanding Toledo Express, approving other geometric configurations for expanding Toledo Express, approving other ways of channelling airplane traffic at Toledo Express, no action by the agency at all, and approving plans for other airports both in the Toledo metropolitan area and out of it, including Baer Field in Fort Wayne. Finally, the EIS briefly explains why the agency eliminated all the alternatives but the first and the fourth. See 40 C.F.R. Sec. 1502.14(a).
 
 
 25
 The FAA's reasoning fully supports its decision to evaluate only the preferred and do-nothing alternatives. The agency first examined Congress's views on how this country is to build its civilian airports. As the agency explained, Congress has told the FAA to nurture aspiring cargo hubs. See AAIA Sec. 502(a)(7), (11), 49 U.S.C. app. Sec. 2201(a)(7), (11).[5] At the same time, however, Congress has also said that the free market, not an ersatz Gosplan for aviation, should determine the siting of the nation's airports. See Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705; see also 14 Weekly Comp.Pres. Doc. 1837, 1837-38 (Oct. 24, 1978) (remarks of Pres. Carter); Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 196 (7th Cir.) ("The decision to make O'Hare, or any other airport, a 'hub' airport belongs to the airlines and not to the government."), cert. denied, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986). Congress has expressed its intent by statute, and the FAA took both of Congress's messages seriously.[6]
 
 
 26
 The FAA also took into account the Port Authority's reasons for wanting a cargo hub in Toledo. In recent years, more than fifty major companies have left the Toledo metropolitan area, and with them, over seven thousand jobs. The Port Authority expects the cargo hub at Toledo Express to create immediately more than two hundred permanent and six hundred part-time jobs with a total payroll value of more than $10 million. After three years, according to the Port Authority, the hub should create directly more than one thousand permanent jobs at the airport and one hundred and fifty other, airport-related jobs. The University of Toledo estimates that the new Toledo Express will contribute at least $42 million to the local economy after one full year of operation and nearly $68 million per year after three. In addition, the Port Authority expects the expanded airport, and Burlington's presence there, to attract other companies to Toledo. All of those factors, the Port Authority hopes, will lead to a renaissance in the Toledo metropolitan region.
 
 
 27
 Having thought hard about these appropriate factors, the FAA defined the goal for its action as helping to launch a new cargo hub in Toledo and thereby helping to fuel the Toledo economy. The agency then eliminated from detailed discussion the alternatives that would not accomplish this goal. Each of the different geometric configurations would mean technological problems and extravagant costs. So would plans to route traffic differently at Toledo Express, or to build a hub at one of the other airports in the city of Toledo. None of the airports outside of the Toledo area would serve the purpose of the agency's action. The FAA thus evaluated the environmental impacts of the only proposal that might reasonably accomplish that goal--approving the construction and operation of a cargo hub at Toledo Express. It did so with the thoroughness required by law. See 40 C.F.R. Sec. 1502.16.[7]
 
 
 28
 We conclude that the FAA acted reasonably in defining the purpose of its action, in eliminating alternatives that would not achieve it, and in discussing (with the required do-nothing option) the proposal that would. The agency has therefore complied with NEPA.
 
 
 29
 (3)
 
 
 30
 Citizens agrees that the FAA need only discuss reasonable, not all, alternatives to Toledo Express. Relying on Van Abbema v. Fornell, 807 F.2d 633 (7th Cir.1986), however, Citizens argues that "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." Id. at 638 (construing NEPA Sec. 102(2)(E), 42 U.S.C. Sec. 4332(2)(E)). According to Citizens, the "general goal" of the Port Authority's proposal is to build a permanent cargo hub for Burlington. Since, in Citizens' view, Fort Wayne (and perhaps Peoria) will accomplish this general goal just as well as Toledo, if not better, Baer Field is a reasonable alternative to Toledo Express, and the FAA should have discussed it in depth. Since it did not, this court should force the FAA to prepare a new (or supplemental) environmental impact statement.
 
 
 31
 We see two critical flaws in Van Abbema, and therefore in Citizens' argument. The first is that the Van Abbema court misconstrued the language of NEPA. Van Abbema involved a private businessman who had applied to the Army Corps of Engineers for permission to build a place to "transload" coal from trucks to barges. See 807 F.2d at 635. The panel decided that the Corps had to survey "feasible alternatives ... to the applicant's proposal," or alternative ways of accomplishing "the general goal [of] deliver[ing] coal from mine to utility." Id. at 638; see also Trout Unlimited v. Morton, 509 F.2d 1276, 1286 (9th Cir.1974). In commanding agencies to discuss "alternatives to the proposed action," however, NEPA plainly refers to alternatives to the "major Federal actions significantly affecting the quality of the human environment," and not to alternatives to the applicant's proposal. NEPA Sec. 102(2)(C), 42 U.S.C. Sec. 4332(2)(C) (emphasis added). An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving its goals, shaped by the application at issue and by the function that the agency plays in the decisional process. Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action. Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be.
 
 
 32
 The second problem with Van Abbema lies in the court's assertion that an agency must evaluate "alternative means to accomplish the general goal of an action," 807 F.2d at 638 (emphasis deleted)--a statement that troubles us even if we assume that the panel was alluding to the general goals of the federal action instead of to the goals of the private proposal. Left unanswered in Van Abbema and Citizens' brief (and at oral argument) is why and how to distinguish general goals from specific ones and just who does the distinguishing. Someone has to define the purpose of the agency action. Implicit in Van Abbema is that the body responsible is the reviewing court. As we explained, however, NEPA and binding case law provide otherwise.
 
 
 33
 (4)
 
 
 34
 In chiding this court for having overreached in construing NEPA, a unanimous Supreme Court once wrote that Congress enacted NEPA "to ensure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency." Vermont Yankee, 435 U.S. at 558, 98 S.Ct. at 1219. We are forbidden from taking sides in the debate over the merits of developing the Toledo Express Airport; we are required instead only to confirm that the FAA has fulfilled its statutory obligations. Events may someday vindicate Citizens' belief that the FAA's judgment was unwise. See id. at 557-58, 98 S.Ct. at 1218-19. All that this court decides today is that the judgment was not uninformed. See Methow Valley, 490 U.S. at 351, 109 S.Ct. at 1846.
 
 B.
 
 35
 The regulations of the Council on Environmental Quality provide that an environmental impact statement "shall [contain] a full and fair discussion of significant environmental impacts" and that "[i]mpacts shall be discussed in proportion to their significance." 40 C.F.R. Secs. 1502.1, 1502.2(b); see NEPA Sec. 102(2)(C)(i), (ii), 42 U.S.C. Sec. 4332(2)(C)(i), (ii). The EIS in this case discusses more than twenty impacts that the expanded Toledo Express would have on the environment, including the airport's effects on people's homes and neighborhoods; on the quality of the air, the water, and the earth; on architectural, archeological, and cultural resources; on sewage disposal; on traffic patterns; on swamps, marshes, bogs, and rivers; and on bats, butterflies, grass, flowers, and trees.[8] The EIS also states flatly that "[a]ircraft sound emissions"--noise, in a word--are "often the most noticeable environmental effect[s] an airport will produce on the surrounding community." In all, the FAA devotes about half of its discussion on environmental consequences to the effects of an increase in noise. Although Citizens does not argue that the FAA failed to discuss the impacts of noise in rough proportion to the effects' importance, it does argue that the discussion is incomplete and unfair. We disagree.
 
 
 36
 The FAA begins its discussion in the EIS by describing how it assesses the effects of more noise. Using the same methods that the EPA and the Department of Housing and Urban Development use, the FAA measures in decibels the average day-night sound levels (Ldn ) produced at particular sites during each twenty-four hour period, then corrects its measurement for variations in airplane speed and formation and the like, adds a ten-decibel penalty for planes that fly at night, and, under certain circumstances, modifies the result depending on the number of people affected. See 14 C.F.R. Sec. 150.7; id. app. A Sec. A150.205 (describing methodology). In response to the EPA's comments on the draft statement, the FAA applied a second method of study, analyzing the effects on noise levels of exposure at twenty-six places to a single event. The EIS thoroughly explains the social, psychological, physical, and structural impacts of noise from Toledo Express. The EIS also explains the resulting Ldn and the single-event analysis in both mathematical equations and readable English and illustrates the text and data in graphs, maps, charts, and tables.
 
 
 37
 Citizens concedes, if only implicitly, that the rule of reason guiding the FAA necessarily covers the agency's discussion of particular environmental impacts. See Natural Resources Defense Council v. Morton, 458 F.2d at 834. Relying on Davison v. Department of Defense, 560 F.Supp. 1019 (S.D.Ohio 1982), however, Citizens contends that in discussing the impacts of noise, a reasonable agency would at least estimate the number of people whom an expanded airport would keep awake. Citizens points out, moreover, that the EPA criticized the FAA's original choice of methods, and that in response to the EPA's comments the FAA agreed to modify its analysis in future cases. For these reasons, Citizens argues, we should find that the FAA's discussion was inadequate.
 
 
 38
 We think that Davison provides only weak support for Citizens' argument. In Davison, the Air Force decided to sell part of an old base to a firm that planned to use it for a cargo hub. Reviewing the adequacy of the resulting EIS, the court held that the Air Force had unreasonably failed to quantify with some precision the people whom the hub activity would keep up at night, had unreasonably neglected to discuss whether local residents would become accustomed to the noise, and had unreasonably overlooked the physiological effects of long-term sleep disturbance. See 560 F.Supp. at 1036-37. Here, in contrast, the FAA did all but the first. On remand in Davison, moreover, the Air Force then stated in a supplement to the final EIS that "from one hundred to one thousand people may be awakened from sleep, possibly repeatedly, for up to four hours per night, approximately 250 nights per year." To the extent that the logic of Davison would impose a similar requirement on the FAA--and the Air Force's estimate in Davison was not quite the paradigm of precision that Citizens demands here--we think it inconsistent with circuit precedent.
 
 
 39
 In examining the impacts of noise on the environment, the FAA relies on wisdom and experience peculiar to the agency and alien to the judges on this court. We have thus held consistently that the rule of reason guides every aspect of the FAA's approach, including its choice of scientific method. See, e.g., Sierra Club v. Department of Transp., 753 F.2d 120, 128 (D.C.Cir.1985); see also Valley Citizens for a Safe Environment v. Aldridge, 886 F.2d 458, 469 (1st Cir.1989). Employing here a method that we have previously endorsed, see Sierra Club v. Department of Transp., 753 F.2d at 128, the FAA proceeded to mold a body of data, dissect it, and display it in comprehensible forms. The agency's choice of method was obviously not capricious. Nor were the factual conclusions that followed. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 109 S.Ct. 1851, 1860-61, 104 L.Ed.2d 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.' " (citations omitted)); Valley Citizens, 886 F.2d at 467-69.
 
 
 40
 The EPA's criticisms of the FAA, and the agencies' subsequent deal, do not change our view of the FAA's findings. Congress wants the EPA to participate when other agencies prepare environmental impact statements. See 42 U.S.C. Sec. 7609(a). The EPA participated here. But the FAA, not the EPA, bore the ultimate statutory responsibility for actually preparing the environmental impact statement, and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly--it just has to take them seriously. See Alaska v. Andrus, 580 F.2d at 474. The FAA considered the EPA's criticisms in this case and decided that enough had been done. That the FAA sensibly resolved to avoid any interagency disputes in the future does not make its decision in this case unreasonable. We uphold the FAA's discussion of the impacts of increased noise.
 
 C.
 
 41
 The regulations of the Council on Environmental Quality require that an environmental impact statement "be prepared directly by or by a contractor selected by the lead agency." 40 C.F.R. Sec. 1506.5(c). If the agency decides to contract out the work on the EIS, the agency must choose the contractor "to avoid a conflict of interest," and the contractor must "execute a disclosure statement prepared by the lead agency ... specifying that [it has] no financial or other interest in the outcome of the project." Id. Citizens argues that the FAA violated the regulations by publishing an EIS prepared for the most part by a contractor (Coffman Associates) that the agency did not itself select and that did not in any event fill out the necessary disclosure forms. The FAA maintains that it (the FAA), and not Coffman, prepared the EIS, that even if Coffman did prepare the EIS, it (the FAA), and not the Port Authority, selected Coffman, and that even though Coffman did not fill out the disclosure statement, its (Coffman's) failure to do so was harmless error.
 
 
 42
 We reject each of the FAA's contentions. Offered the choice of preparing the environmental impact statement in-house, the FAA chose the other permissible option and hired consultants, including Coffman. The FAA then wrote the consultants' names and qualifications, including Coffman's, in a chapter of the EIS entitled "List of Preparers," see id. Sec. 1502.17, a gesture that undermines the agency's current litigating position--that Coffman did not prepare the EIS, but that the FAA did instead, mostly by commenting actively on Coffman's drafts. Ultimately, however, the agency's theory founders on the plain meaning of the regulations. Although the CEQ regulations do not define the word "prepare," the dictionary does; in context, it means here "to put into written form: draw up ... ." Webster's Third New Int'l Dictionary 1790 (unabridged ed.1981); see Sierra Club v. Marsh, 714 F.Supp. 539, 550-51 (D.Me.1989). That is just what Coffman did, as the agency freely admits. We need not decide whether the FAA's active editing of Coffman's drafts--behavior consistent with the agency's obligation to "furnish guidance" to consultants and "participate in the preparation [of] and ... independently evaluate the statement prior to its approval," 40 C.F.R. Sec. 1506.5(c)--made it, too, a preparer of the EIS. We are certain, however, that Coffman's initial drafts and responses to the FAA's comments made Coffman more than the agency's amanuensis.
 
 
 43
 Once the FAA decided not to prepare the environmental impact statement directly, it was obliged to pick a contractor itself, and not to delegate the responsibility. See id. The EIS states that the Port Authority, not the agency, chose Coffman to work on the environmental assessment, and later, on the environmental impact statement. The EIS also states that the agency "concurred" in Coffman's selection. The FAA argues that its concurrence in the Port Authority's choice satisfied its duty under the regulations. We need not page through the dictionary at length to decide that concurring in someone else's choice of consultant is not the same as choosing a consultant of one's own.
 
 
 44
 By failing to select the consultant that prepared the environmental impact statement, the FAA violated CEQ regulations. Citizens urges us to remedy this breach by invalidating the EIS. We see no reason to do so, however, at least not solely on the ground that the FAA neglected to search on its own for a competent contractor. This particular error did not compromise the "objectivity and integrity of the [Nepa] process." Forty Questions, 46 Fed.Reg. at 18,031; see Sierra Club v. Sigler, 695 F.2d 957, 963 n. 3 (5th Cir.1983) (CEQ regulations are " 'designed ... to minimize the conflict of interest inherent in the situation of those outside the government coming to the government for money, leases or permits while attempting impartially to analyze the environmental consequences of their getting it.' " (quoting 43 Fed.Reg. 55,987 (1978))); cf. 40 C.F.R. Sec. 1500.3 ("[I]t is the [CEQ's] intention that any trivial violation of these regulations not give rise to any independent cause of action.").
 
 
 45
 The more serious infraction, in our view, was Coffman's failure to fill out the disclosure form exacted of consultants that prepare environmental impact statements. See id. Sec. 1506.5(c). Citizens points out that Coffman (in addition to having prepared the EIS) has started to prepare the Port Authority's Part 150 study, and that the scope of the study will vary directly with the status of the airport (since the Port Authority is relying on the study to fine tune its mitigation plans). The FAA argues that Coffman had no reason to know while preparing the EIS that the agency would want it to expand the Part 150 study. The FAA may well be correct, but neither the petitioners nor this court can know for certain in the absence of a completed disclosure form. Moreover, the CEQ regulations prohibit broadly any "financial or other interest in the outcome of the project." Id. (emphasis added); see Forty Questions, 46 Fed.Reg. at 18,031 (interpreting "conflict of interest" to mean "any known benefits other than general enhancement of professional reputation"). The FAA promised the petitioners in a letter that "Coffman does not have an undisclosed stake in the project that would potentially disqualify it." That ipse dixit does not reassure us. We therefore order the FAA to have Coffman execute an appropriate disclosure statement, see 40 C.F.R. Sec. 1506.5(c), and, should the agency find that a conflict exists, to decide--promptly--on the measures to take in response.
 
 III.
 
 46
 Under section 4(f) of the Department of Transportation Act of 1966, the Secretary of Transportation may not approve a project requiring the use of a park unless he determines, first, that there is no "prudent and feasible alternative" to using the land, and second, that the project includes "all possible planning to minimize harm to the park ... resulting from the use." Transportation Act Sec. 4(f), 49 U.S.C. Sec. 303(c).[9] The FAA (which is part of the Department of Transportation, see 49 U.S.C. Sec. 106(a)) acknowledged that the proposed expansion of Toledo Express would constructively "use" the Springbrook campground since flights from the airport would subject the camp to nighttime noise of up to Ldn 75 decibels, about 10 to 15 decibels more than now. Cf. Allison v. Department of Transp., 908 F.2d 1024, 1030 (D.C.Cir.1990) (no section 4(f) use when a park is subjected to only minor increases in airplane noise). The agency nonetheless decided that while there might be a feasible alternative to using the campground, cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (alternative is "feasible" unless "as a matter of sound engineering" it should not be built), there existed no prudent one, and that the project would ease the harm to Springbrook by moving it elsewhere inside the park, but outside the reach of Ldn 65 decibels. Citizens argues that a feasible and prudent alternative to using the campground did exist: leaving the airport in Toledo alone and expanding the airport in Fort Wayne instead. Citizens also argues that the project does not adequately diminish the harm to Springbrook because the FAA did not consider, among other ideas, fining the owners of planes that are noisy, and because the FAA has not said where exactly in Oak Openings it plans to put the new campground.
 
 
 47
 Overton Park instructs courts to undertake "a thorough, probing, in-depth review" of decisions under section 4(f), 401 U.S. at 415, and to canvass the facts of section 4(f) cases "searching[ly] and careful[ly]," id. at 416. Our ultimate standard of review is nonetheless deferential. See id.; Eagle Found., Inc. v. Dole, 813 F.2d 798, 804 (7th Cir.1987). We are entrusted with ensuring that the agency looked hard at the pertinent facts and thought hard about the relevant factors. See id. at 803. We are required to repudiate agency caprice. Once we determine that the agency's decision was reasonable, however, we are not entitled to displace its decision with our own or with anyone else's. See Overton Park, 401 U.S. at 416, 91 S.Ct. at 823.
 
 
 48
 Reasoning by analogy to NEPA, the FAA argues that an alternative must be imprudent under section 4(f)(1) if it fails to accomplish a proposal's objectives. According to the FAA, since a hub in Fort Wayne would do nothing for Toledo, and since the health of the Toledo economy was a primary reason for the Port Authority's application, Fort Wayne was an imprudent alternative and the FAA did not act arbitrarily in approving the use of Springbrook. In effect, the FAA's argument would mean that anytime an alternative is unreasonable under NEPA (and thus would not have to be discussed in detail in the environmental impact statement), the alternative would also be imprudent within the meaning of section 4(f)(1) of the Transportation Act (and thus would not block approval of a transportation project).
 
 
 49
 Although an agency's analysis under NEPA and the Transportation Act might proceed in similar tracks, the two statutes are not precisely the same. The Transportation Act differs from NEPA in at least two ways. First, the Transportation Act requires the agency to evaluate "prudent ... alternatives to using th[e] land "--alternatives to the project, that is--not alternatives to the federal action. Second, contrary to the FAA's argument, the case law uniformly holds that an alternative is imprudent under section 4(f)(1) if it does not meet the transportation needs of a project. See Hickory Neighborhood Defense League v. Skinner, 910 F.2d 159, 164 (4th Cir.1990); Druid Hills Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 715 (11th Cir.1985); Arizona Past & Future Found. v. Dole, 722 F.2d 1423, 1428-29 (9th Cir.1983). The Transportation Act is similar to NEPA in that the agency bears the responsibility for defining at the outset the transportation goals for a project and for determining which alternatives would reasonably fulfill those goals.
 
 
 50
 Having focused on the statutes' apparent similarities, and disregarded their differences, the FAA never quite specified with ideal coherence the transportation goals of the project at Toledo Express. In future cases, the agency should bear in mind the differences between NEPA and the Transportation Act, and the agency's section 4(f) documentation package should reflect the concerns specific to the latter statute. Still, in approving in this case the use of the park in Toledo, the FAA reasonably defined the transportation goals of the project as providing the Toledo area with a modern, effective cargo hub. Given this definition of the project's aims, the FAA need not have examined in detail the relative flaws of Baer Field, including its antiquated condition, its distance from Burlington's main markets (Detroit and Chicago), Fort Wayne's limited pool of labor, and the city's failure to come up with the necessary financing. It was enough for the agency to find that a hub in Baer Field would not fulfill the transportation goals of the project at Toledo Express and that Fort Wayne was therefore less than a prudent alternative to using Toledo. Because its conclusion was reasonable, the FAA did not violate section 4(f)(1).
 
 
 51
 Nor did the FAA violate section 4(f)(2), which requires that the "project include[ ] all possible planning to minimize harm to the park." Light from the expanded Toledo Express airport might temporarily blind amateur astrophotographers, and planes, in addition to stars, might appear in their pictures. More noise would make camping at Springbrook less enjoyable. The FAA thus plans to install shielded, low-pressure sodium lights in the airport's parking lots and to move the campground somewhere else in the park, out of the range of the Ldn 65 decibels. Citizens accepts the measures meant to save astrophotography, but it (and the EPA) would rather the FAA try other tactics to save the present campground, such as fining the owners of noisy planes or requiring the use of noise barriers. If Springbrook is to be moved, moreover, Citizens wants to know exactly where.
 
 
 52
 The deference we pay to decisions under section 4(f)(1), however, see Eagle Found., 813 F.2d at 803-08, applies as well to decisions under section 4(f)(2), see Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 65-66 (D.C.Cir.1987). Congress wanted the agencies, not the courts, to evaluate plans to reduce environmental damage. The FAA thoroughly examined the impacts that the airport's expansion would have on protected parkland and proposed various tactics to mitigate them. The FAA then decided (with the support of the Department of the Interior) to move the campground to the half of Oak Openings that falls outside the range of Ldn 65 decibels. Citizens, dissatisfied, wants us to force the FAA to pinpoint the new campground's geographic coordinates. But federal courts are neither empowered nor competent to micromanage strategies for saving the nation's parklands. See id. at 66. Because the FAA's decision in this case does not reflect "a clear error of judgment," we are constrained to let it stand. Overton Park, 401 U.S. at 416, 91 S.Ct. at 823.
 
 IV.
 
 53
 Under section 509(b)(5) of the Airport and Airway Improvement Act of 1982 (AAIA), the FAA may not approve a project that harms the environment unless the agency first determines that there is no "feasible and prudent alternative" and that "all reasonable steps have been taken to minimize [the] adverse effect." AAIA Sec. 509(b)(5), 49 U.S.C. app. Sec. 2208(b)(5).[10] Citizens argues that any time the FAA violates section 4(f)(1) of the Transportation Act, the agency automatically violates section 509(b)(5) of the AAIA as well. We recognize that some of section 509(b)(5) parrots some of section 4(f)(1). An agency that fails to choose a "prudent and feasible alternative," AAIA Sec. 509(b)(5), 49 U.S.C. App. Sec. 2208(b)(5), obviously fails at the same time to choose a "feasible and prudent alternative," Transportation Act Sec. 4(f)(1), 49 U.S.C. Sec. 303(c)(1). The agency can violate or observe two statutes synchronously. But we have already determined that the FAA did not violate section 4(f)(1): Fort Wayne was an imprudent, if feasible, alternative to Toledo. Therefore, although we agree in principle with this aspect of Citizens' theory, we have little trouble deciding under section 509(b)(5) that while Fort Wayne may have been a feasible alternative to Toledo, it was also an imprudent one.
 
 
 54
 We have also upheld in this case the informal finding required by section 4(f)(2) of the Transportation Act, that the Toledo Express project includes "all possible planning to minimize harm" to Oak Openings. Transportation Act Sec. 4(f)(2), 49 U.S.C. Sec. 303(c)(2) (emphasis added). Section 509(b)(5) of the AAIA, though roughly congruous, commands agencies to find that "all reasonable steps have been taken to minimize such adverse effect." AAIA Sec. 509(b)(5), 49 U.S.C. App. Sec. 2208(b)(5) (emphasis added). We do not decide whether and under what circumstances a mitigation plan that is unreasonable would still be possible--that is, whether the FAA might have to implement plans under section 4(f)(2) that it would not have to implement under section 509(b)(5).[11] We do decide, however, that all plans that are impossible are necessarily unreasonable--that is, that when the FAA does not have to implement a particular plan under section 4(f)(2) of the Transportation Act, it is also spared from having to implement that plan under section 509(b)(5) of the AAIA. The FAA has done all that it could have for Oak Openings. It has therefore done all that it should have. With respect to Oak Openings, the FAA has not violated section 509(b)(5).
 
 
 55
 Section 509(b)(5), however, does cover more than just parks and historic landmarks. The statute applies to virtually everything environmental. Compare AAIA Sec. 509(b)(5), 49 U.S.C. app. Sec. 2208(b)(5) ("natural resources including, but not limited to, fish and wildlife, natural, scenic, and recreation assets, water and air quality, and other factors affecting the environment") with Transportation Act Sec. 4(f), 49 U.S.C. Sec. 303(c) ("publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance"). Citizens thus argues further that whatever the FAA has planned for Oak Openings, the agency has violated section 509(b)(5) with respect to other areas of the environment affected by the proposed expansion. Again, we disagree.
 
 
 56
 The EIS in this case states that the Port Authority has promised to take several steps to blunt the impact of the increased noise; those measures include buying out the owners of every private house and nursing home within range of more than Ldn 75 decibels, insulating doors and windows in homes subjected to noise between Ldn 70 and 75 decibels, and buying easements from the owners of homes within the reach of Ldn 65 to 70 decibels. The EIS estimates how much the mitigation plans will cost. The EIS explains that the Part 150 study (which requires that the FAA consider certain minimum noise-control alternatives) will help flesh out the details of the mitigation plans.[12] The EIS also notes that the FAA will impose conditions on its grants designed to ensure that the Port Authority delivers. Citizens, dissatisfied, wants the specifics now; it demands that the FAA finish its Part 150 study before the agency be allowed to approve the Toledo proposal. Citizens demands further that the FAA actually execute its mitigation strategy before Burlington starts flying out of Toledo. In Citizens' view, the latter is required by section 509(b)(5) and the former is required both by section 509(b)(5) and by the Supreme Court's interpretation of NEPA in Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
 
 
 57
 We think that Citizens reads too much into both Methow Valley and section 509(b)(5). Neither prescribes specific form or content for environmental impact statements. Instead, as the Supreme Court noted in passing, both the CEQ regulations and NEPA itself compel only "a reasonably complete discussion of possible mitigation measures." 490 U.S. at 352, 109 S.Ct. at 1846; see id. at 351-52, 109 S.Ct. at 1846-47 (interpreting NEPA Sec. 102(2)(C)(ii), 42 U.S.C. Sec. 4332(2)(C)(ii), and 40 C.F.R. Secs. 1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c)); Forty Questions, 46 Fed.Reg. at 18,031-32. The EIS in this case may not be flawless, but it certainly is reasonably complete.
 
 
 58
 The same is true of the Port Authority's mitigation plans. NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies--or third parties--to effect any. See Methow Valley, 490 U.S. at 353 & n. 16, 109 S.Ct. at 1847 & n. 16. Section 509(b)(5), in contrast, does "impose substantive environmental obligations on federal agencies." Id. at 351, 109 S.Ct. at 1846. But section 509(b)(5) does not order agencies to take all steps to lessen environmental trauma, just all reasonable ones. Congress has entrusted the FAA with the statute's administration, and in interpreting section 509(b)(5)'s ambiguous language the FAA reasonably concluded that a detailed mitigation plan, coupled with grounds to believe that the plan will be implemented, is enough of a "reasonable step." We do not mean to suggest that the agency's program is perfect; indeed, the FAA acknowledges that the Part 150 study by itself would not nearly be enough to satisfy the statute. But the Port Authority's Part 150 study will be detailed, as the law requires, and we do not think that the agency committed a "clear error of judgment" in deciding to use the study to perfect the timing of an otherwise concrete proposal. Overton Park, 401 U.S. at 416, 91 S.Ct. at 823. The FAA has therefore met its obligations under the statute.
 
 V.
 
 59
 We hold that the FAA has fulfilled the requirements of NEPA, the Transportation Act, the AAIA, and all the CEQ regulations but one. We therefore grant the petition for review and remand to the agency so that it may comply with 40 C.F.R. Sec. 1506.5(c). We affirm the FAA's decision in all other respects. Given the limited nature of what remains for the agency to do, we decline to enjoin the continuing development of Toledo Express or to grant any other of the equitable relief that the petitioners have asked for. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 541-46, 107 S.Ct. 1396, 1401-04, 94 L.Ed.2d 542 (1987); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.").
 
 
 60
 It is so ordered.
 
 BUCKLEY, Circuit Judge, dissenting in part:
 
 61
 Burlington Air Express and the Federal Aviation Administration might be right: On substantial economic and environmental balance, Toledo Express Airport may well be the only suitable site for Burlington's air cargo hub. The public cannot know for certain, however, and neither can the FAA. By refusing to inquire into the feasibility of sites rejected by Burlington, the agency sidestepped its obligation to prepare "a detailed statement ... on ... alternatives to the proposed action." 42 U.S.C. Sec. 4332(2)(C) (1988). The majority endorses this evasion. I cannot, and therefore I dissent from part II(A) of the majority opinion. While "the concept of 'alternatives' is an evolving one," Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 552, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978), judicial evolution may not reduce it to a vermiform appendix.
 
 I.
 
 62
 In a narrow sense, the only federal action that is involved when a non-federal applicant seeks federal approval or funding is the agency's decision to grant or deny the applicant's request. No one disputes, however, that the agency's environmental impact statement ("EIS") must inquire into reasonable alternatives to the applicant's proposal. The only controversy is over the nature of the alternatives that the EIS should consider. See, e.g., Friends of the River v. FERC, 720 F.2d 93, 104-05 (D.C.Cir.1983) (permit to operate hydroelectric plant; alternative of purchasing power from other producers); Mason County Med. Ass'n v. Knebel, 563 F.2d 256, 262-63 (6th Cir.1977) (permit to build coal-fired steam electric generator; alternatives of nuclear, geothermal, conservation, purchased power, and others); North Carolina v. FPC, 533 F.2d 702, 707 (D.C.Cir.) (permit to build hydroelectric plant; alternative of conservation), vacated on other grounds, 429 U.S. 891, 97 S.Ct. 250, 50 L.Ed.2d 174 (1976).
 
 
 63
 The majority would limit the consideration of alternatives to those available to the Toledo-Lucas County Port Authority. As the majority sees it, the FAA "defined the goal for its action as helping to launch a new cargo hub in Toledo and thereby helping to fuel the Toledo economy." As a consequence, airports outside the Toledo area were not to be considered because "[n]one ... would serve the purpose of the agency's action." Maj. op. at 379. I read the EIS differently. Recognizing that Burlington is an essential party to the Port Authority's application, the FAA understands that the EIS must consider any reasonable alternative to Toledo Express Airport that might be available to Burlington, whether it lies within the Toledo area or outside it.
 
 
 64
 Thus, while the EIS begins by reviewing the proposed construction and expansion of the Toledo Express Airport, EIS at 1-1, it pays particular attention to Burlington. The "Background" section recounts Burlington's existing operations at Fort Wayne, Burlington's unsuccessful negotiation for the expanded facilities required for a permanent hub at Fort Wayne, Burlington's decision to look elsewhere, Burlington's analysis of seventeen sites, and Burlington's ultimate selection of Toledo. Id. at 1-2. The "Alternatives" section rejects the other four airports in the Toledo area in part because their expansion would take longer, and "Burlington officials have indicated they cannot accommodate an extended time period." Id. at 2-15. As for airports elsewhere, the EIS declares that "Burlington officials have indicated that Fort Wayne is not a permanent alternative," and that other airports surveyed by Burlington's consultants were rejected "because of the advantages of the Toledo Express Airport." Id. at 2-15, 2-16. The "Benefits of Proposed Project" section acknowledges the economic advantages that will flow to Toledo, but links them to Burlington's decision to locate there. "The Proposed Project, while serving a demand that is being created by Burlington Air Express's decision to locate in Toledo, will provide economic benefits and employment opportunities to the community." Id. at 1-4. Burlington makes the demands that define the project; Toledo enjoys the benefits that result.
 
 
 65
 The FAA takes a broader view of its responsibilities because it acknowledges that the proposed project is intended to serve several purposes. Toledo seeks the substantial economic benefits that will accrue from the establishment of an air cargo hub in its metropolitan area. Burlington seeks a home for its air cargo operations, one that will be tailored to its specifications. For its part, the FAA is conscious of its mandate, under the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. app. Sec. 2201(a)(7) (1988), to encourage the development of a national system of air cargo hubs. See EIS at S-1 to S-2.
 
 
 66
 I cannot fault the FAA for the attention given Burlington and its preferences. While both Toledo and Burlington are indispensable to the enterprise, Burlington is plainly the dominant partner; its requirements and desires shaped the project from the start. As the agency points out in its Record of Decision ("ROD"), "[t]he demand for this project is clearly based on a business decision by Burlington Air Express and the interest of a local airport sponsor, the Toledo-Lucas County Port Authority, in accommodating and facilitating this decision." ROD at 29.
 
 
 67
 I do fault the agency for failing to attend to its own business, which is to examine all alternatives "that are practical or feasible from the technical and economic standpoint ... rather than simply desirable from the standpoint of the applicant." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed.Reg. 18,026, 18,027 (1981) (emphasis omitted). As far as I can tell, the FAA never questioned Burlington's assertions that of the ones considered, Toledo Express is the only airport suitable to its purposes. Instead, the agency simply accepted Burlington's "Toledo-or-bust" position. Thus, the EIS notes that Burlington hired consultants to help it choose a new hub site, and that the consultants prepared a confidential report. EIS at 2-1 to 2-2. The impact statement fails to summarize the report; indeed, it does not say whether Burlington made the document available to the FAA. The EIS reports that a letter from the consultants demonstrates that Burlington's Toledo decision rests on "legitimate business interests." Id. at 2-2. Of Burlington's decision to leave Fort Wayne, the FAA's Record of Decision similarly declares: "This is a business decision on the part of Burlington, in which the FAA has not been involved." ROD at 10. The FAA thus accepts at face value Burlington's assertion that it had no second choice. See EIS at 2-16; ROD at 30-31.
 
 
 68
 Burlington's stance may have been at least partly tactical. The consultants told the FAA that their "overall business judgement ... was to recommend Toledo"; they made no claim that Toledo was the only feasible site among the seventeen examined. EIS app. at E-64. In its comments on the EIS, Burlington conceded that it "would obviously have preferred to remain at Fort Wayne." Id. app. at E-28. A principal obstacle was money: "Fort Wayne was unable to compose a competitive funding package and development plan for a permanent hub," id., whereas Toledo "worked diligently" to produce a "creative" funding package, id. app. at E-27.
 
 
 69
 Nevertheless, Fort Wayne kept trying; in an April 1990 letter, the Fort Wayne-Allen County Airport Authority assured Burlington that "it is totally feasible to expect to structure a financial package for Fort Wayne similar to that currently under consideration at Toledo." Joint Appendix 266. Replying in early May 1990--the same month the final EIS was issued--Burlington expressed appreciation for the "cooperative and constructive tone of your letter" and "the really outstanding character of the Airport Authority," and said that it would "look to Fort Wayne for support and solutions as and if our Toledo commitment is altered by any of the risks or uncertainties that lie ahead." Id. at 268.
 
 
 70
 Although this exchange was not part of the record at the time the EIS was prepared, parties commenting on the EIS inquired about newspaper reports of reopened negotiations between Burlington and Fort Wayne, and the FAA asked the company to clarify its position. In a letter dated June 27, 1990, its Chief Executive Officer stated "for the record that Burlington does not have any existing viable alternative to the proposed new hub project at Toledo." ROD at 30-31. Once again, the FAA took Burlington at its word: "Base [sic] on this reconfirmation of the findings in the FEIS [Final EIS], the FEIS need not be revised or supplemented to consider Fort Wayne as a reasonable alternative." Id. at 31.
 
 
 71
 I do not suggest that Burlington is untrustworthy, only that the FAA had the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project. It may well be that none of the sixteen other alternatives examined by Burlington and its consultants could be converted into a viable air cargo hub at acceptable cost. That, however, was something that the FAA should have determined for itself instead of accepting as a given. Under NEPA, "the federal agency must itself determine what is reasonably available." Trinity Episcopal School Corp. v. Romney, 523 F.2d 88, 94 (2d Cir.1975); see Van Abbema v. Fornell, 807 F.2d 633, 642 (7th Cir.1986) (condemning agency's "blind reliance on material prepared by the applicant"). By allowing the FAA to abandon this requirement, the majority establishes a precedent that will permit an applicant and a third-party beneficiary of federal action to define the limits of the EIS inquiry and thus to frustrate one of the principal safeguards of the NEPA process, the mandatory consideration of reasonable alternatives.
 
 
 72
 The majority and the FAA respond to any suggestion that Fort Wayne might be a feasible alternative by emphasizing that the federal government can no longer tell carriers where to place hub airports. Maj. op. at 378; EIS app. at C-16. They miss the point. While the agency cannot tell Burlington where to go, it can refuse to approve the Toledo project, or to provide any funding for it. The agency's Record of Decision acknowledges as much: "While the FAA is not in a position to control or direct the actions and decisions of Burlington or of [Toledo], the FAA does have the ability to support or withhold approval for the proposed federal actions...." ROD at 9. It is the exercise of that discretion that the EIS is supposed to inform.
 
 
 73
 Had the FAA rejected the proposal on the ground that Fort Wayne is a feasible, environmentally preferable alternative, it would not have been ordering Burlington "to establish hubbing operations at a specific airport." EIS app. at C-16. Burlington would still have been free to seek out another location, as it insisted it would should the Toledo application be denied. Rather, the agency would simply have exercised its statutory responsibility to base its decision on a "comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action." NRDC v. Morton, 458 F.2d 827, 833 (D.C.Cir.1972).
 
 II.
 
 74
 Even if the FAA had correctly concluded that the only reasonable alternative was "No Action," its EIS would still be flawed. By viewing the no-action alternative exclusively through Toledo's eyes, it failed to appreciate that that city's gains must necessarily be Fort Wayne's losses. Thus the EIS informs us that whereas the proposed project would produce 750 new jobs and $17 million for the Toledo economy during the first full year of operation, EIS at 1-4, "the no-action alternative would mean foregoing ... [these] economic benefits." Id. at 2-13.
 
 
 75
 This analysis suggests that the jobs and dollars will arise spontaneously from the Toledo soil. In reality, Toledo's gains will come at Fort Wayne's expense. Burlington's Fort Wayne payroll is $8 million, id. app. at B-92; its Toledo payroll will begin at $9 million, id. at 1-4. If the project were canceled, Toledo would forego "substantial economic benefits," id. at 2-13; but, unless Burlington were to shut down entirely, which it has asserted it will not, Toledo's loss would be offset by jobs and economic activity in Fort Wayne, or whatever other city ultimately served as Burlington's permanent hub.
 
 
 76
 More broadly, by emphasizing the economic consequences to Toledo, the FAA and the majority seem to view the Airports and Airways Improvement Act as an urban welfare statute. As the EIS notes, the AAIA merely directs the FAA "to facilitate the establishment of air cargo hubs" in the United States. Id. at 1-3. While a city will inevitably benefit economically from proximity to a major airport, this is no more than a by-product of federal funding under the AAIA. From a national perspective, it is of little consequence whether the beneficiary of this federal activity is Toledo or some other community.
 
 
 77
 The FAA was probably free to disregard economic effects in the EIS. See CEQ Regulations, 40 C.F.R. Sec. 1508.14 (1990) (requiring discussion of economic effects only if they are "interrelated" with natural environmental effects). Once it undertook to discuss them, however, it was obliged to be impartial; an EIS "must be objectively prepared and not slanted to support the choice of the agency's preferred alternative." Forty Questions, 46 Fed.Reg. at 18,027. Because the FAA's no-action analysis failed to recognize the impact on the Fort Wayne economy, it failed to meet the standard of objectivity required by NEPA.
 
 III.
 
 78
 The EIS requirement "seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project ... which would alter the environmental impact and the cost-benefit balance." Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 449 F.2d 1109, 1114 (D.C.Cir.1971). With its uncritical dismissal of alternatives and its myopic view of economic consequences, the EIS here fell short of this objective. As a result, we cannot be confident that in approving Toledo's applications, the FAA took the pertinent environmental as well as economic and technical considerations into the balance. And that, of course, is the purpose of the National Environmental Policy Act.
 
 
 79
 By sanctioning the FAA's approach, the majority in effect allows a non-federal party to sort out alternatives based entirely on economic considerations, and then to present its preferred alternative as a take-it-or-leave-it proposition. If allowed to stand, today's decision will undermine the NEPA aim of "inject[ing] environmental considerations into the federal agency's decisionmaking process." Weinberger v. Catholic Action of Hawaii/Peace Educ. Proj., 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). The discussion of reasonable alternatives--"the heart of the environmental impact statement," 40 C.F.R. Sec. 1502.14--becomes an empty exercise when the only alternatives addressed are the proposed project and inaction.
 
 
 80
 In our first encounter with NEPA twenty years ago, we spoke of the duty to ensure that "important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." Calvert Cliffs', 449 F.2d at 1111. Because I believe that the court today shirks that duty, I respectfully dissent.
 
 
 
 [1]
 See also NEPA Sec. 2, 42 U.S.C. Sec. 4321:
 The purposes of [NEPA] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation....
 
 
 [2]
 The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall--
 (C) include in every major recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 NEPA Sec. 102, 42 U.S.C. Sec. 4332; see also 40 C.F.R. Sec. 1508.12 (defining "Federal agency"); id. Sec. 1508.18 ("major Federal action"); id. Sec. 1508.27 ("significantly"); id. Sec. 1508.3 ("affecting"); id. Sec. 1508.14 ("human environment").
 
 
 [3]
 See Methow Valley, 490 U.S. at 349, 109 S.Ct. at 1845; see also 40 C.F.R. Sec. 1502.14 ("This section ... should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.")
 
 
 [4]
 Cf. 115 Cong.Rec. 40,420 (Dec. 20, 1969) (remarks of Sen. Jackson) ("alternatives" means "[t]he alternative ways of accomplishing the objectives of the proposed action and the results of not accomplishing the proposed action")
 
 
 [5]
 The Congress hereby finds and declares that--
 (7) cargo hub airports play a critical role in the movement of commerce through the airport and airway system and appropriate provisions should be made to facilitate the development of and enhancement of such airports;
 (11) airport construction and improvement projects which increase the capacity of facilities to accommodate passenger and cargo traffic, thereby increasing safety and efficiency and reducing delays, should be undertaken to the maximum feasible extent....
 AAIA Sec. 502(a), 49 U.S.C. app. Sec. 2201(a).
 
 
 [6]
 Citizens' view would require the FAA to canvass the business choices that Burlington faced when it considered leaving Fort Wayne. But the agency has neither the expertise nor the proper incentive structure to do so (it has no shareholders who would suffer from mistaken judgments). And while Congress clearly wanted NEPA to extend federal agencies' range of vision to environmental concerns, it did not, so far as we can tell, aim at agencies' acquiring the skills of successful entrepreneurs. NEPA is supposed to make agencies more sensitive--but only, by definition, to matters environmental
 
 
 [7]
 Judge Buckley maintains that the FAA, having decided to discuss the socioeconomic impacts of inaction in Toledo on Toledo, was obliged then in its "No Action" section to discuss the socioeconomic impacts of inaction in Toledo on Fort Wayne. See post at 209-10. As Judge Buckley's dissent reveals, see id., information concerning Fort Wayne's economy is already available for consumption elsewhere in the EIS. See Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137, 1142-43 & n. 5 (D.C.Cir.1991). In any event, the FAA also discussed the (beneficial) environmental effects of inaction in Toledo on Toledo, so one can infer that it should have discussed the (presumably negative) environmental effects of inaction in Toledo on Fort Wayne. Because Toledo's loss would be many other cities' potential gain, moreover, there would be no reason to limit the FAA's discussion to Fort Wayne: Indeed, one can infer that the FAA should have discussed the socioeconomic and environmental impacts of inaction in Toledo on Peoria, Akron, Detroit, and every other site assessed by Burlington's consultant. Cf. post at 207-10
 The EIS demonstrates that the discussion of the socioeconomic and environmental impacts of inaction is the flip side of the discussion of the impacts of action. If, for example, the FAA were to approve the Port Authority's application, Toledo would lose environmentally but gain socioeconomically, and Peoria and Fort Wayne and the other cities would lose socioeconomically but gain environmentally. If the FAA were to reject the Port Authority's application, Toledo would remain somewhat quieter but lose some jobs, and either Peoria (or another city) might gain noise along with jobs or Fort Wayne might retain some of both. But the FAA was not obliged to discuss the environmental or socioeconomic impacts of approving airport expansions in Peoria or Fort Wayne or any of the other cities: None, as we have explained, would have fulfilled the goal of the agency's action, and all were therefore unreasonable and beyond the scope of the FAA's responsibilities. The upshot of Judge Buckley's approach, it seems to us, would be to force an agency to discuss the socioeconomic and environmental impacts of even unreasonable alternatives--to do the very thing in the section on the do-nothing alternative that the agency need not do in the statement's main body.
 
 
 [8]
 Interestingly enough, birds and deer show no signs of being affected by the noise or exhaust fumes at the Toledo Express Airport, and officials of the Ohio Department of Natural Resources have also seen there some endangered animals, such as the spotted turtle (Clemmys guttata ). State officials report that endangered plants, such as the cross-leaved milkwort (Polygala cruciata ) and twisted yellow-eyed grass (Xyris torta ), are even thriving right beside the main runways
 
 
 [9]
 The Secretary [of Transportation] may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance ... only if--
 (1) there is no prudent and feasible alternative to using that land; and
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 Transportation Act Sec. 4(f), 49 U.S.C. Sec. 303(c).
 
 
 [10]
 [T]he Secretary [of Transportation] shall consult with the Secretary of the Interior and the Administrator of the [EPA] with regard to any project included in a project grant application involving airport location, a major runway extension, or runway location which may have a significant impact on natural resources including, but not limited to, fish and wildlife, natural, scenic, and recreation assets, water and air quality, and other factors affecting the environment, and shall authorize no such project found to have significant adverse effect unless the Secretary shall render a finding ... that no feasible and prudent alternative exists and that all reasonable steps have been taken to minimize such adverse effect
 AAIA Sec. 509(b)(5), 49 U.S.C. app. Sec. 2208(b)(5).
 
 
 [11]
 Cf. AAIA Sec. 509(d), 49 U.S.C. app. Sec. 2208(d):
 Nothing in this subsection shall affect or discharge any responsibility or obligation of the Secretary under any other federal law, including ... the National Environmental Policy Act of 1969 [or] section 303 of this title [section 4 of the Transportation Act]....
 
 
 [12]
 Under the FAA's regulations, the operator of an airport must report on:
 (1) Acquisition of land and interests therein, including ... air rights, easements, and development rights, to ensure the use of property for purposes which are compatible with airport operations.
 (2) The construction of barriers and acoustical shielding, including the soundproofing of public buildings.
 (3) The implementation of a preferential runway system.
 (4) The use of flight procedures (including the modification of flight tracks) to control the operation of aircraft to reduce exposure of individuals (or specific noise sensitive areas) to noise in the area around the airport.
 (5) The implementation of any restriction on the use of [the] airport by any type or class of aircraft based on the noise characteristics of those aircraft....
 
 
 [14]
 C.F.R. app. B Sec. B150.7(b)